FILED

AUG 14 2017

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

1          <u>NOT FOR PUBLICATION</u>

2

3          UNITED STATES BANKRUPTCY COURT

4          EASTERN DISTRICT OF CALIFORNIA

5

6   In re:                              )    Case No. 11-37711-B-7
                                        )
7   DELANO RETAIL PARTNERS, LLC,        )    Adversary No. 16-2146
                                        )
8                                       )    DC Nos. HSM-1
                        Debtor.         )           DBR-1
9   _____ )
                                        )
10  SUSAN K. SMITH, Chapter 7           )
    Trustee,                            )
11                                      )
                                        )
12                      Plaintiff,      )
                                        )
13  v.                                  )
                                        )
14  C&S WHOLESALE GROCERS, INC., a      )
    Vermont Corporation,                )
15                                      )
                                        )
16                      Defendant.      )
    _____ )
17  C&S WHOLESALE GROCERS, INC., a      )
18  Vermont Corporation,                )
                                        )
19                      Counterclaimant,)
                                        )
20  v.                                  )
                                        )
21  SUSAN K. SMITH, Chapter 7           )
    Trustee,                            )
22                                      )
                        Counterdefendant.)
23  _____ )

24

25      **MEMORANDUM DECISION GRANTING TRUSTEE'S MOTION FOR SUMMARY**
           **JUDGMENT AND DENYING C&S's MOTION FOR SUMMARY JUDGMENT**
26

27

28

1  **INTRODUCTION**

2      There are two motions for summary judgment presently before

3  the court.  Plaintiff Susan K. Smith, in her capacity as the

4  trustee appointed in the parent chapter 7 case ("Trustee")

5  captioned <u>In re Delano Retail Partners, LLC</u>, case no. 11-37711,

6  filed one summary judgment motion.  Defendant C&S Wholesale

7  Grocers, Inc. ("C&S"), a purported secured creditor in the parent

8  chapter 7 case, filed the other.

9      Delano Retail Partners, LLC ("DRP") is the debtor in the

10 parent chapter 7 case.  Dennis Delano and Harley Delano

11 ("Delanos") are the managers of DRP.  DRP's attorney was Joseph

12 Neri ("Neri").  The Delanos also formed another entity by the

13 name of 2040 Fairfax, Inc. ("2040 FF").  The relationship of the

14 parties and these entities is discussed in greater detail below.

15     The Trustee commenced this adversary proceeding by filing a

16 complaint on July 22, 2016.  The first four claims for relief in

17 that complaint are for declaratory relief.  For lack of a better

18 description, those claims concern funds identified as four

19 "buckets" of money which consist of the following:

20     (1)    approximately $429,505.00 received or to be
21             received from the settlement of the estate's
22             claims against the Delanos, 2040 FF, and Neri that
                C&S purchased from the Trustee, thereafter
                prosecuted, and ultimately settled (the
23             "Settlement Funds");

24     (2)    approximately $384,000.00 of an original balance of
                approximately $560,000.00 that DRP transferred from its
25             bank account to Neri's client trust account prepetition
                and which thereafter was transferred from Neri's client
26             trust account to the Trustee (the "Neri Trust Account
                Funds");

27     (3)    approximately $153,410.08 the Trustee collected
                from 2040 FF postpetition for 2040 FF's lease of
28             DRP's furniture, fixtures, and equipment under a

prepetition asset lease agreement (the "Asset Lease Payments"); and

(4)    approximately $37,661.60 the Trustee received from the sale of DRP's liquor licenses (the "Liquor License Proceeds").

The Trustee seeks a declaration that the funds in each of the "buckets" are not subject to C&S's prepetition security interest and therefore belong to the estate free and clear. The fifth claim for relief in the complaint is a claim under 11 U.S.C. § 542(a) for turnover of the Settlement Funds.

C&S filed an answer and counterclaim on September 6, 2016. The counterclaim asserts the same four claims for declaratory relief that are asserted in the complaint (but in different order). It seeks a declaration opposite of that requested in the complaint. In other words, whereas the Trustee seeks a declaration that all of the funds in each of the four above-referenced "buckets" are not subject to C&S's prepetition security interest, C&S seeks a declaration that all of the funds in each of those "buckets" are subject to its prepetition security interest.

The Trustee filed the initial summary judgment motion on May 5, 2017. C&S opposed the Trustee's summary judgment motion on May 23, 2017, and the Trustee replied on May 30, 2017. C&S filed a memorandum of points and authorities on May 5, 2017, and its summary judgment motion on May 9, 2017. The Trustee opposed C&S's summary judgment motion on May 23, 2017, and C&S replied on May 30, 2017. A hearing on the parties' cross-motions for summary judgment was held on June 9, 2017. Appearances at that hearing were noted on the record.

- 3 -

In reaching its decision, the court has reviewed and considered the following documents: (i) with regard to the Trustee's summary judgment motion, docket nos. 32-39, 49-56, 64-70, 76, 82, 86 & 89; and (ii) with regard to C&S's summary judgment motion, docket nos. 40-48, 57-63, 71-74, 75, 83, 86 & 88. The court also takes judicial notice of the dockets in this adversary proceeding and in the parent chapter 7 case, the dockets in related adversary proceedings nos. 12-02686 and 13-02250 filed in this court, and the dockets in related case nos. 2:13-cv-01413-TLN-AC, 2:14-cv-02215-TLN-DAD, and 2:14-cv-02263-TLN filed in the district court.[1] The court has also relied on the parties' stipulated undisputed facts and facts the parties submitted that the court has discerned are not in dispute.[2]

**FACTUAL BACKGROUND**

I.    Generally

C&S is a grocery wholesaler that sold store inventory to DRP before DRP filed its voluntary chapter 7 petition. In 2006 C&S and DRP executed a supply agreement, promissory note, and security agreement. In connection with those agreements, C&S loaned DRP $2,000,000.00 to purchase assets and equipment for stores, including stores that DRP acquired from Ralph's Grocery Company and specifically including a store located at 2040 Sir

---

[1]The requests for judicial notice at dkts. 44, 53, & 60 are granted.

[2]Except for plaintiff's objection 1.a. [dkt. 59] which is sustained inasmuch as it is not necessary for the court to reach the "equities of the case issue," all other objections at dkts. 51 and 59 are overruled.

1 | Francis Drake Blvd., Fairfax, California.

2 |     The loan from C&S to DRP is evidenced by the promissory

3 | note, which is secured by the security agreement.  The security

4 | agreement grants C&S a security interest in numerous classes of

5 | DRP's assets, all of which are identified in the security

6 | agreement submitted as an exhibit to the motion.  Relevant here

7 | are all claims, accounts, general intangibles, chattel paper,

8 | deposit accounts, leases, inventory, furniture, fixtures, and

9 | equipment, and all proceeds of the foregoing.  C&S's security

10 | interest in this collateral is perfected by a UCC-1 financing and

11 | two continuation statements.

13 | II.  <u>As Specifically Relating to Each of the Four "Buckets"</u>

14 |      A.   <u>The Settlement Funds</u>: Trustee's First Claim for Relief
   |           in the Complaint & C&S's Fourth Claim for Relief in the
15 |           Counterclaim [$429,505.00]

16 |     In November 2012 C&S filed an adversary complaint that named

17 | the Delanos, 2040 FF, and Neri as defendants.  That complaint

18 | alleged fraudulent transfer claims, and claims for conspiracy to

19 | commit and aiding and abetting in the commission of fraudulent

20 | transfers.

21 |     In March 2013 the Delanos, 2040 FF, and Neri moved to

22 | dismiss the adversary complaint.  Those defendants asserted that

23 | the claims alleged in the complaint belonged to the estate and

24 | therefore C&S lacked standing to prosecute them on its own

25 | behalf.  The Trustee also asserted ownership of the claims.

26 | After C&S moved in April 2013 to prosecute the estate's claims in

27 | place of the Trustee and for the benefit of the estate, C&S and

28 | the Trustee entered into a stipulation in May of 2013 that

1  authorized C&S to prosecute the estate's claims, including those
2  alleged in the 2012 adversary complaint.   There are two
3  significant paragraphs in that stipulation.

4       The first is ¶ 1 which pertains to the consideration that
5  C&S agreed to pay the Trustee for its purchase—and the Trustee's
6  sale—of the estate's claims.   Paragraph 1 states that "in
7  consideration of payment to the Trustee for the benefit of DRP's
8  estate out of any settlement, judgment or other recovery" C&S
9  would pay the Trustee (i) a minimum of $250,000.00, (ii) an
10 additional $50,000.00 of any amount between $300,000.00 and
11 $1,000,000.00, and (iii) the $250,000.00 and the $50,000.00 plus
12 25% of any amount over $1,000,000.00.

13      The second is ¶ 3 which states as follows:

14      The terms for payment as set forth herein shall be
        without prejudice to, and shall not affect, C&S'
15      assertion of any secured and unsecured claims herein,
        as well as the Trustee's right to dispute, contest, or
16      otherwise object to any such claims, all of which
        rights and remedies are hereby preserved and unaffected
17      by this stipulation.

18      The Trustee filed a motion to approve the stipulation in May
19 2013.   The court (Holman, J.) heard that motion on June 18, 2013,
20 and also treated it as a motion to sell the estate's claims to
21 C&S.   During the hearing on the motion, and without any objection
22 from or disagreement by C&S, the Trustee explained ¶ 3 of the
23 stipulation as follows:

24      And as the trustee made clear in her reply to the
        Fund's opposition, the ability to object to C&S's **claim**
25      is preserved to the estate.   All rights are reserved
        here.   If the trustee feels that there has been some
26      sort of double dipping or double recovery to C&S as a
        result of the litigation, she retains the ability under
27      the Bankruptcy Code to object to that **proof of claim**
        and will do so if that serves the interest of the
28      estate.

                            - 6 -

Hr'g Tr. at 6:9-17 (emphasis added).

The order granting the motion and approving the May 2013 stipulation and sale of the estate's claims to C&S was entered in July 2013. Thereafter, C&S owned 100% of the estate's claims and it asserted its ownership of those claims in pleadings filed in subsequent litigation involving the purchased claims. C&S also characterizes all of the claims it bought from the estate as its collateral and the proceeds received in settlement of the estate's claims as a replacement for its damaged or destroyed collateral.

C&S settled the estate's claims against the Delanos and 2040 FF in January of 2015. That settlement agreement requires 2040 FF to make 42 monthly payments of $10,833.00 each from February 2015 to July 2018, with increasing payments thereafter to and including January 2022. Under that settlement agreement, 2040 FF agreed to pay a total of $1,518,020.00 to C&S by January 2022. C&S also settled the estate's claims against Neri in July of 2015. That settlement agreement requires Neri to pay $40,000.00. Based on the amounts of those settlements, $429,505.00 is at issue with regard to this "bucket".

      B.    <u>Neri Trust Account Funds</u>: Trustee's Fourth Claim for Relief in the Complaint and C&S's First Claim for Relief in the Counterclaim [$384,000.00]

From 2009 to 2010, several of DRP's grocery stores in Northern California experienced a downturn in business and began shutting down. As the remaining DRP stores (other than Fairfax) went out of business, DRP sold inventory.

In late 2010, DRP transferred $560,000.00 from its bank

account to Neri's client trust account. There is also deposition testimony that inventory proceeds were deposited into Neri's client trust account in late 2010. That same deposition testimony also reflects that whatever the extent of inventory proceeds that went into Neri's client trust account, those proceeds were not segregated and, in fact, were commingled with other funds that belonged to a "Peterson" and other unidentified operational funds.

In any case, of the $560,000.00 that was deposited into Neri's client trust account in late 2010, $384,000.00 was transferred from Neri's client trust account to the Trustee in July 2011. The reduction resulted from withdrawals from the trust account to pay DRP's taxes, payroll, and employment department claims. An order entered in prepetition state court litigation also authorized a withdraw from the account to pay expenses associated with that litigation.

       C.    <u>Asset Lease Funds</u>:  Trustee's Third Claim for Relief in the Complaint & C&S's Second Claim for Relief in the Counterclaim [$153,410.08]

In 2008 the Delanos formed 2040 FF with Neri's assistance. DRP terminated its rights under an existing sublease of the Fairfax store and, simultaneously, 2040 FF negotiated a new long-term lease for that store. DRP and 2040 FF executed a sublease agreement for the Fairfax store under which DRP agreed to pay the monthly rent due under 2040 FF's new long-term lease. DRP and 2040 FF also executed an agreement under which DRP agreed to use its license, permits, employees, and other resources to operate the Fairfax store on behalf of 2040 FF.

1     Relevant for purposes of this "bucket" is that in January

2  2010 DRP entered into what is referred to as an "Asset Lease"

3  with 2040 FF under which DRP leased its furniture, fixtures, and

4  equipment in the Fairfax Store to 2040 FF in exchange for semi-

5  annual payments from 2040 FF.  After DRP filed its chapter 7

6  petition, payments under the Asset Lease were collected directly

7  by the Trustee.  Prepetition those payments were made to DRP.

8  The Trustee has collected approximately $153,410.08.

9

10        D.    <u>Liquor License Sale Funds</u>: Trustee's Second Claim for
               Relief in the Complaint & C&S Third Claim for Relief in

11            the Counterclaim [$37,661.60]

12     DRP owned several liquor licenses which were used in

13  connection with grocery store operations.  The Trustee sold those

14  liquor licenses to third parties during the administration of the

15  bankruptcy case.  The Trustee received net sales proceeds of

16  approximately $37,661.60 from those sales.  C&S claims those

17  funds as proceeds of its collateral consisting not of the liquor

18  licenses themselves but, rather, as proceeds of the liquor

19  licenses as general intangibles.

20

21  **JURISDICTION**

22     Federal subject matter jurisdiction is founded on 28 U.S.C.

23  § 1334.  This adversary proceeding is a core proceeding under 28

24  U.S.C. §§ 157(b)(2) (A), (B), (E), (K), and (0).  To the extent

25  this adversary proceeding may ever be determined to be a matter

26  that a bankruptcy judge may not hear and determine without

27  consent, the parties nevertheless consent to such determination

28  by a bankruptcy judge.  <u>See</u> 28 U.S.C. § 157(c)(2).  Venue is

1 | proper under 28 U.S.C. § 1409.

2

3 | **LEGAL STANDARD**

4 | Summary judgment is proper where "the pleadings,

5 | depositions, answers to interrogatories, and admissions on file,

6 | together with the affidavits, if any, show that there is no

7 | genuine issue as to any material fact and that the moving party

8 | is entitled to a judgment as a matter of law." Fed. R. Civ. P.

9 | 56(c); Fed. R. Bankr. P. 7056. The moving party has the burden

10 | of demonstrating the absence of a genuine issue of fact.

11 | Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). That

12 | burden may be discharged by showing, *i.e.*, pointing out, that

13 | there is an absence of evidence to support the nonmoving party's

14 | case. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

15 | Thereafter, the nonmoving party bears the burden of designating

16 | specific facts demonstrating genuine issues for trial. In re

17 | Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

18 | In examining a motion for summary judgment, "the inferences

19 | to be drawn from the underlying facts . . . must be viewed in the

20 | light most favorable to the party opposing the motion." U.S. v.

21 | Diebold, Inc., 369 U.S. 654, 655 (1962). However, the nonmoving

22 | party's allegation that factual disputes persist will not

23 | automatically defeat an otherwise properly supported motion for

24 | summary judgment. See Fed. R. Civ. P. 56(e). And a "mere

25 | 'scintilla' of evidence will be insufficient to defeat a properly

26 | supported motion for summary judgment; instead, the nonmoving

27 | party must introduce some 'significant probative evidence tending

28 | to support the complaint.'" Fazio v. City & County of San

1  <u>Francisco</u>, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting <u>Anderson</u>,

2  477 U.S. at 249, 252). The court does not weigh conflicting

3  evidence; rather, it asks whether the nonmoving party has

4  produced sufficient evidence to permit the factfinder to hold in

5  its favor. <u>Ingram v. Martin Marietta Long Term Disability Income</u>

6  <u>Plan for Salaried Employees of Transferred GE Operations</u>, 244

7  F.3d 1109, 1114 (9th Cir. 2001).

8      Cross-motions for summary judgment evaluated separately,

9  giving the nonmoving party in each instance the benefit of all

10  reasonable inferences. <u>A.C.L.U. of Nev. v. City of Las Vegas</u>, 466

11  F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation

12  omitted); <u>Pintos v. Pac. Creditors Ass'n</u>, 605 F.3d 665, 674 (9th

13  Cir. 2010). In evaluating the motions, "the court must consider

14  each party's evidence, regardless under which motion the evidence

15  is offered." <u>Las Vegas Sands, LLC v. Nehme</u>, 632 F.3d 526, 532

16  (9th Cir. 2011).

17

18  **DISCUSSION**

19  I.   <u>The Cross-Motions for Summary Judgment</u>

20      A.   <u>The Settlement Funds are not Collateral or Proceeds</u>

21            <u>that Replace Damaged or Destroyed Collateral.</u>

22      This "bucket" contains the proceeds received and to be

23  received in settlement of the estate's claims against the

24  Delanos, 2040 FF, and Neri. C&S maintains those funds, including

25  the consideration it is obligated to pay the Trustee for its

26  purchase of those claims from the Trustee, are encumbered by its

27  security interest either as its collateral, *i.e.*, the claims, or

28  as the replacement of damaged or destroyed collateral, *i.e.*, the

1   settlement proceeds.  The Trustee, on the hand, maintains that
2   the consideration portion of the Settlement Funds are not subject
3   to any security interest.  For the reasons explained below, the
4   Trustee is correct.

5        It is true that DRP granted C&S a security interest in "all
6   claims."  It is also true that settlement proceeds can be a
7   replacement for original collateral that is damaged or destroyed.
8   O.H. Kruse Grain and Milling v. United California Bank (In re
9   Wiersma), 324 B.R. 92, 106 (9th Cir. BAP 2005), aff'd in part,
10  rev'd in part, 483 F.3d 933 (9th Cir. 2007), and aff'd in part,
11  277 Fed. Appx. 603 (9th Cir. 2007); In re Endresen, 530 B.R. 856,
12  869 (Bankr. D. Or. 2015), aff'd in part, rev'd in part, 548 B.R.
13  258 (9th Cir. BAP 2016).  However, at least in this case, an
14  admission by C&S negates the possibility of any such outcome.

15       The Trustee cites In re Ice Mgmt. Sys., Inc., 2014 WL
16  6892739 (9th Cir. BAP 2014), for the proposition that the portion
17  of the Settlement Funds described in the May 2013 stipulation as
18  the consideration C&S is obligated to pay the Trustee for its
19  purchase of the estate's claims are not encumbered by C&S's
20  prepetition security interest.  In an effort to distinguish Ice
21  Management from this case, and to refute the Trustee's argument,
22  C&S makes the following statement which the court treats as an
23  admission:[3]

24  ───────────────────

25       [3]The court exercises its discretion to treat the statement
    as an admission.  See American Title Ins. Co. v. Lacelaw Corp.,
26  861 F.2d 224, 227 (9th Cir. 1988).  The statement was not
    inadvertent.  It was made in the context of a request by C&S for
27  affirmative relief.  The court pointed out the statement to C&S's
    attorney when the parties' summary judgment motions were heard on
28  June 9, 2016, and since that time C&S has not amended, retracted,
    or assigned any error to the statement.  See Sicor Ltd. v. Cetus

1    Unlike in *Ice*, the Trustee here did *not* sell an
     encumbered asset, such as an intellectual property
2    right belonging to DRP or, for example, an item of real
     or personal property that was subject to an existing
3    lien or security interest. Rather, *the Trustee sold
     the Estate's claims*-claims that only *she* had standing
4    to prosecute.

5    Dkt. 71 at 9:8-12 (emphasis in original).

6        Short of buying claims from the same individual who sold

7    Jack his magic beanstalk beans, the admission that the estate's

8    claims, *i.e.*, the very claims that C&S bought from the Trustee,

9    prosecuted, and settled resulting in the Settlement Funds, are

10   not (and when bought were not) encumbered can only mean those

11   claims are not (and when bought were not) subject to any security

12   interest under the security agreement between C&S and DRP. That

13   means the claims are not (and could not be) collateral. That

14   also means proceeds received in settlement of the unencumbered

15   claims likewise are not (and could not be) a replacement for

16   original collateral—damaged, destroyed, or otherwise.

17       The admission by C&S that the Trustee did not sell it

18   encumbered claims also sheds light on the purpose of ¶ 3 of the

19   May 2013 stipulation. The purpose of that paragraph could not be

20   to preserve a security interest in the consideration portion of

21   the Settlement Funds - or any portion of the Settlement Funds for

22   that matter - because the paragraph cannot be read to preserve

23

24   Corp., 51 F.3d 848, 859-860 (9th Cir.), cert. denied, 116 S.Ct.
     170 (1995) (stating that where "the party making an ostensible
25   judicial admission explains the error in a subsequent pleading or
     by amendment, the trial court must accord the explanation due
26   weight"); see also Westgate Communications, LLC v. Chelen County,
     Fed. Appx. 708 (9th Cir. 2013) (district court properly declined
27   to treat statement in memorandum as admission where statement was
     read out of context, inadvertent, party making statement timely
28   confessed error, and statement retracted).

1  that which C&S admits does not (and when it bought the estate's

2  claims from the Trustee did not) exist, *i.e.*, a security

3  interest.

4       The Trustee's statements during the hearing on the motion to

5  approve the stipulation and sale of the estate's claims to C&S

6  are also independent evidence that the purpose of ¶ 3 of the May

7  2013 stipulation was not to preserve any security interest.

8  Rather, as the Trustee explained, the purpose of that paragraph

9  was to preserve the secured and unsecured claims that C&S

10 asserted in its proof of claim and the Trustee's ability to

11 object to the proof of claim to prevent a double recovery by C&S

12 on both the proof of claim and the estate's claims.  C&S did not

13 object to or otherwise dispute the Trustee's explanation of ¶ 3

14 when it was given.  And it does not do so now with any admissible

15 evidence.

16      Finally, it is also worth noting that the motion to approve

17 the stipulation and Trustee's sale of the estate's claims to C&S

18 was considered in the context of the Woodson and A&C factors.[4]

19 That standard requires the court to find that a proposed

20 settlement and compromise provides some benefit to the estate and

21 creditors.  If Judge Holman understood that the consideration C&S

22 agreed to pay the Trustee for its purchase of the estate's claims

23 was subject in its entirety to a security interest so that the

24 estate effectively received nothing in exchange for the sale of

25 its claims to C&S, he could not have found that the stipulation

26 

27      [4]Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839
   F.2d 610 (9th Cir. 1988); Martin v. Kane (In re A&C Properties),
28 784 F.2d 1377 (9th Cir. 1986).

1  and motion to approve it satisfied the <u>Woodson</u> and <u>A&C</u> factors.

2       The benefit to the estate from the stipulation and the

3  Trustee's sale of the estate's claims to C&S comes in the form of

4  the "consideration" that C&S is now obligated to pay the Trustee

5  for its purchase of the estate's claims.  That consideration is a

6  clearly-defined structured payment arrangement pursuant to which

7  C&S is obligated to pay the Trustee a total of $429,505.00.  In

8  other words, what the estate has following approval of the

9  stipulation and the Trustee's sale of the estate's claims to C&S

10 is an unencumbered postpetition bargained-for contract and right

11 to payment.  Both are property of the estate under § 541(a)(7) of

12 the Bankruptcy Code which includes "[a]ny interest in property

13 that the estate acquires after the commencement of the case."  11

14 U.S.C. § 541(a)(7); <u>see also</u> <u>Carroll v. Tri-Growth Centre City,</u>

15 <u>Ltd. (In re Carroll)</u>, 903 F.2d 1266, 1270 (9th Cir. 1990)

16 (typical § 541(a)(7) property of estate is a postpetition

17 contract); <u>In re MCEG Productions, Inc.</u>, 133 B.R. 232, 235

18 (Bankr. C.D. Cal. 1991) (postpetition compromise agreement).[5]

19      In short, C&S is obligated to pay $429,505.00 as

20 consideration for its purchase of the estate's claims from the

21 Trustee.  That payment - like the entirety of the Settlement

22 Funds - is not subject to any security interest and is property

23 _____

24      [5]The significance of this conclusion is discussed in Section
   II, <u>infra</u>.  This conclusion also raises interesting questions not
25 presently before the court, but which perhaps could be:  By
   withholding payment from the estate does the Trustee, on behalf
26 of the estate, now have a claim against C&S for violation of 11
   U.S.C. § 362(a)(3) which prohibits an "act to obtain possession
27 of property of the estate or of property from the estate or to
   exercise control over property of the estate[?]"  And if C&S
28 violated § 362(a)(3) is it now liable to the estate for actual,
   and potentially punitive, damages under 11 U.S.C. § 362(k)?

1 of the estate.  Therefore, for the foregoing reasons, the court

2 will grant summary judgment for the Trustee on the First Claim

3 for Relief in the complaint and will deny summary judgment for

4 C&S on the Fourth Claim for Relief in the counterclaim.

6       B.    <u>The Neri Trust Account Funds are not Encumbered by
C&S's Security Interest.</u>

8     This "bucket" includes the funds that were transferred from

DRP's bank account to Neri's client trust account in late 2010,

and thereafter transferred from Neri's client trust account to

the Trustee in 2011.  DRP's bank account from which these funds

came is a "deposit account" within the meaning of California

Commercial Code § 9102(a)(29).  So too is Neri's client trust

account.  <u>In re Allied Respitory Care Services, Inc.</u>, 182 B.R.

589, 593-595 (Bankr. S.D. Fla. 1995).

    A financing statement is not effective to perfect a security

interest in a deposit account.  <u>See</u> Cal. Comm. Code § 9310(b)(8).

In fact, except when proceeds in a deposit account are already

subject to a perfected security interest under California

Commercial Code §§ 9315(c) and (d), a security interest in a

deposit account is perfected only by control.  <u>See</u> Cal. Comm.

Code §§ 9312(b) & (b)(1); §§ 9314(a) & (b).  A secured party has

control over a deposit account for purposes of perfection of a

security interest under any of the following conditions: (i) the

secured party is the bank where the funds are deposited; (ii) the

secured party, the debtor, and the bank enter into a deposit

control agreement; or (iii) the security agreement becomes the

bank's customer with respect to the deposit account.  <u>See</u> Cal.

- 16 -

1   Comm. Code §§ 9104(a)(1)-(3).

2        C&S has produced no evidence of control over any DRP bank

3   account, much less any bank account into which inventory proceeds

4   were supposedly deposited.  The same is true with regard to

5   Neri's client trust account.  There is no evidence that C&S

6   exercised control over either account.  For example, C&S is not

7   the bank where the funds were deposited, it produced no deposit

8   control agreement for either account, and it has not established

9   that it is a customer of the institutions where either account

10  was maintained with respect to either account.  Consequently, C&S

11  has failed to establish that it has a perfected security interest

12  in DRP's bank account and in Neri's client trust account as

13  deposit accounts.  But that does not end the inquiry.

14       A secured creditor can retain a perfected security interest

15  in a deposit account as proceeds to the extent funds credited to

16  the deposit account are proceeds of the secured creditor's

17  primary collateral.  <u>Stierwalt v. Associated Third Party</u>

18  <u>Administrators</u>, 2016 WL 2996936, *3 (N.D. Cal. 2016).  However, a

19  "transferee" of funds from a deposit account takes the funds from

20  the deposit account free of any security interest.  <u>See</u> Cal.

21  Comm. Code § 9332.  And as explained below, that includes the

22  Trustee who is, and who C&S acknowledges is, a "transferee."

23       The parties stipulated that $560,000.00 went from DRP's bank

24  account to Neri's client trust account in late 2010.  There is

25  also deposition testimony that in late 2010 inventory proceeds

26  were deposited into Neri's client trust account.  Construing that

27  evidence favorably to C&S, that could mean that the funds that

28  went *into* Neri's client trust account in late 2010 were all

                            - 17 -

inventory proceeds and, as such, were subject to C&S's security interest. But even if that is the case, when those funds were *transferred out* of Neri's client trust account to the Trustee they were free and clear of any security interest when received by the Trustee. There are two paths to this conclusion.

In <u>Orix Fin. Serv., Inc. v. Kovacs</u>, 167 Cal. App. 4th 242 (Cal. App. 2008) (as modified October 16, 2008), a debtor business defaulted on its financial obligation to Orix which was secured by all of the business's goods, chattels, and property. <u>Id.</u> at 246. Separately, defendant Kovacs obtained a judgment against the business and executed on the business's deposit account. <u>Id.</u> All of the funds in that deposit account were proceeds from the sale of the business's inventory and collection of its accounts receivables, which meant all of the deposits were subject to Orix's security interest. <u>Id.</u> Kovacs' execution on the business's deposit account prompted Orix's suit against Kovacs. <u>Id.</u> The trial court sustained a demure by Kovacs and Orix appealed. <u>Id.</u> at 245.

On appeal, Kovacs conceded that Orix's position as a secured creditor was superior to its own as a judgment creditor. <u>Id.</u> at 246. However, Kovacs argued that such an analysis was irrelevant to the question of the satisfaction of his judgment from the funds in the business's deposit account, which it maintained was wholly free of any such priority analysis because of California Commercial Code § 9332(b). <u>Id.</u> The California appellate court agreed with Kovacs and held that, as a judgment creditor, Kovacs was a transferee under California Commercial Code § 9332(b) who took funds from the business's deposit account free and clear of

1  *any* security interest.  Id. at 245, 251.  Notably, the court

2  supported its holding by reference to Harley-Davidson Motor Co.

3  v. Bank of New England-Old Colony N.A., 897 F.2d 611, 622 (1st

4  Cir. 1990), in which U.S. Supreme Court Justice Breyer referred

5  to comment 2(c) of U.C.C. § 9-306 from which California

6  Commercial Code § 9332(b) is derived to note that the purpose

7  behind § 9-306 was (and thence § 9332(b) is) to explicitly

8  exclude any judicial efforts to trace identifiable secured

9  proceeds paid out of a commingled deposit account.  Orix

10  Financial, 167 Cal. App. 4th at 248.

11      More recently, Stierwalt, supra, involved a similar dispute

12  between a judgment creditor who levied on funds in the judgment

13  debtor's bank account and a secured creditor who claimed a

14  security interest in the judgment debtor's bank account as a

15  deposit account and as proceeds of its collateral.  Stierwalt,

16  2016 WL 2996936 at *1, *2.  In the absence of the requisite

17  control, the court concluded that the secured creditor lacked a

18  perfected interest in the bank account as a deposit account.  Id.

19  at *3.  More importantly, the court recognized that the proceeds

20  in the bank account were identifiable proceeds and, as such,

21  subject to the secured creditor's security interest as proceeds

22  of its contract rights collateral.  Id. at *4-*5.  Nevertheless,

23  relying on Orix Financial, the court concluded that the secured

24  creditor's security interest in the funds as proceeds of its

25  contract rights collateral did not survive the transfer of those

26  funds out of the deposit account to the judgment creditor who, as

27  in Orix Financial, was a transferee under California Commercial

28  Code § 9332(b).  Id. at *6-*8.

1    The Trustee cites <u>Orix Financial</u> to support her position

2  that the $384,000.00 transferred to her from Neri's client trust

3  account is not encumbered by C&S's security interest.   In

4  response to that argument, C&S acknowledges that <u>Orix Financial</u>

5  holds that a judgment creditor is a transferee under § 9332(b) of

6  the California Commercial Code who takes funds from a deposit

7  account free and clear.  However, C&S maintains that <u>Orix</u>

8  <u>Financial</u> and § 9332(b) are inapplicable because the Trustee is

9  not, and when she received the $384,000.00 from Neri's client

10  trust account was not, a judgment creditor.  More precisely, C&S

11  states as follows:

> [T]he Trustee cites [<u>Orix</u>], but as the <u>Orix</u> court
> explained, 'This case presents a very narrow
> question-one of first impression in California: Is an
> unsecured judgment creditor, who satisfied its judgment
> from deposit account funds, included in the definition
> of a 'transferee' as contemplated by section 9332(b),
> such that it may take those funds free of any security
> interest?'  <u>Id.</u> at 245.  The court held that the answer
> to that question was 'yes.'  In other words, an
> unsecured judgment creditor may satisfy its judgment
> from deposit accounts [sic] funds and take such funds
> 'free and clear.'  But it is undisputed that the
> Trustee was not a judgment creditor and did not obtain
> what remained of the $560,000 by way of a lawsuit and
> subsequent satisfaction of judgment.

20  Dkt. 71 at 15:14-16.  And that is where C&S's argument collapses.

21    C&S fails to recognize that § 544(a) of the Bankruptcy Code

22  confers upon the Trustee the status of a hypothetical judgment

23  creditor and lienholder as of the date a bankruptcy petition is

24  filed.  <u>See</u> 11 U.S.C. § 544(a); <u>Neuton v. Danning (In re Neuton)</u>,

25  922 F.2d 1379, 1383 (9th Cir. 1990); <u>In re Lloyd</u>, 511 B.R. 657,

26  659 (Bankr. D. Ariz. 2014).  Thus, as C&S acknowledges and <u>Orix</u>

27  <u>Financial</u> and <u>Stierwalt</u> hold, that makes the Trustee a transferee

28  under § 9322.  And that means the Trustee took the Neri Trust

- 20 -

1  Account Funds from Neri's client trust account free and clear of
2  any existing security interest.  Therefore, for the foregoing
3  reasons, the court will grant summary judgment for the Trustee on
4  the Fourth Claim for Relief in the complaint and will deny
5  summary judgment for C&S on the First Claim for Relief in the
6  counterclaim.

7       Alternatively, it is true as C&S points out, a security
8  interest attaches to identifiable proceeds of collateral.  See
9  Cal. Comm. Code § 9315(a)(2).  It also is true that a security
10 interest in proceeds is perfected if the security interest in the
11 original collateral was perfected.  See Cal. Comm. Code §
12 9315(c).  However, a security interest in proceeds only remains
13 perfected for twenty days and becomes unperfected on the twenty-
14 first day unless one of three conditions is satisfied.  See Cal.
15 Comm. Code § 9315(d).

16      The first condition applies to maintain perfection if (i) a
17 filed financing statement covers the original collateral, (ii)
18 the proceeds are collateral that could be perfected by filing a
19 financing statement, and (iii) the proceeds are not acquired with
20 cash proceeds.  See Cal. Comm. Code § 9315(d)(1)(A)-(C).  Here,
21 the proceeds are either cash or a deposit account.  A security
22 interest in either is not perfected by a financing statement.
23 The former requires possession for perfection, see Cal. Comm.
24 Code §§ 9312(b)(3) & 9313(a), and, as explained above, the latter
25 requires control for perfection.  There is no evidence that C&S
26 took possession of any inventory cash proceeds (the testimony is
27 that they were deposited into bank accounts) and, as noted above,
28 there is no evidence that C&S had control over any deposit

- 21 -

1  account.  Thus, while a security interest in the original

2  collateral, *i.e.*, inventory, could be perfected by a financing

3  statement, a security interest in proceeds of that collateral,

4  *i.e.*, cash or a deposit account, could not.  Consequently, the

5  first condition is not satisfied.

6       The second condition is also not satisfied.  The second

7  condition allows perfection to be maintained in "identifiable

8  proceeds."  See Cal. Comm. Code § 9315(a)(2).  However, once cash

9  proceeds are deposited into an account and commingled with other

10  money the identifiability of a secured creditor's proceeds is

11  destroyed unless the secured creditor can prove that the money in

12  the account corresponds to its collateral.  Arkison v. Frontier

13  Asset Mgmt., LLC (In re Skagit Pacific Corp.), 316 B.R. 330, 338

14  (9th Cir. BAP 2004).  That is done by tracing proceeds in the

15  commingled account to the collateral.  See Cal. Comm. Code §

16  9315(b)(2).  The burden of tracing rests with the secured

17  creditor claiming a security interest in the proceeds.  Id.

18  (citing Stoumbos v. Kilimnik, 988 F.2d 949, 957 (9th Cir. 1993));

19  Chrysler Credit Corp. v. Superior Court, 17 Cal. App. 4th 1303,

20  1311 (Cal. App. 1993).  The secured creditor meets that burden by

21  submitting detailed testimony or documentary evidence that

22  establishes a transactional link between the proceeds and the

23  collateral.  Arkinson, 316 B.R. at 338 (citing Stoumbos, 988 F.2d

24  at 958); see also In re Sunrise R.V., Inc., 107 B.R. 277, 282

25  (Bankr. E.D. Cal. 1989).

26       The burden here is on C&S, as the secured creditor claiming

27  a security interest in the funds transferred from Neri's client

28  to the Trustee, to establish those funds are proceeds of its

inventory collateral. Evidence of tracing, if it can be
considered that, is limited to conclusory and speculative
deposition testimony that inventory proceeds went into Neri's
client trust account in late 2010 and a spreadsheet that reflects
"approximately five deposits" over a three-month period between
October and December 2010. Even if that sufficed to establish
what went into Neri's client trust account, it does not establish
a link between the funds that Neri transferred from his client
trust account to the Trustee back to C&S's original inventory
collateral. In other words, it is not *detailed* evidence of
tracing.

　　　　For example, there is no evidence that once in Neri's client
trust account inventory proceeds were and remained segregated.
In fact, the same deposition testimony on which C&S relies to
establish that inventory proceeds went into Neri's client trust
account also reflects that once in that account the inventory
proceeds were commingled with at least $100,000.00 in other funds
that did not belong to DRP and some other unidentified
operational funds. Moreover, because $100,000.00 in the account
did not belong to DRP and belonged to someone named "Peterson,"
sometime after inventory proceeds were deposited in Neri's client
trust account and thereafter commingled with other funds in that
account Neri transferred $100,000.00 to a separate "Peterson"
account. But what $100,000.00 did Neri transfer? C&S does not
answer that question with any admissible evidence. And what of
the other operational funds in the account - what where they and
where did they come from? Again, C&S does not answer those
questions with admissible evidence.

1    The problem for C&S is that there is no detailed evidence in
2  the form of deposition testimony or documentation that traces the
3  $384,000.00 that was transferred to the Trustee in 2011 back
4  through Neri's client trust account to funds apparently
5  transferred from DRP's bank account and finally back to proceeds
6  of original inventory collateral.  Thus, even if all the deposits
7  that went into Neri's client trust account in late 2010 were
8  inventory proceeds going in, C&S has failed to establish they
9  remained identifiable in the account and when thereafter
10 transferred out of the account.  Consequently, the second
11 condition is also inapplicable.

12    The third condition is the simplest.  If the proper steps
13 for perfecting a security interest in the type of collateral that
14 constitutes proceeds are taken before the twenty-first day after
15 the security interest attaches to the proceeds, perfection is
16 maintained.  See Cal. Comm. Code. § 9315(d)(3).  Again, there is
17 no evidence that C&S ever took possession of any inventory
18 proceeds within twenty days of any inventory sales and, as
19 explained above, there is no evidence it had control over any
20 deposit account.  Accordingly, this third condition is likewise
21 inapplicable.

22    In sum, and alternatively, even if the Neri Trust Account
23 Funds were proceeds of DRP's inventory collateral when they went
24 into Neri's client trust account in late 2010, there is no
25 evidence that C&S retained a perfected security interest in those
26 proceeds in 2011 when they were transferred out of the trust
27 account to the Trustee.  That would mean when the funds were
28 transferred from Neri's client trust account to the Trustee in

- 24 -

2011, at best, C&S would have had an unperfected security interest in the inventory proceeds.  That would also mean that, as a hypothetical judgment creditor and lienholder under § 544(a), the Trustee's interest in the Neri Trust Account Funds would be superior to C&S's unperfected security interest in the same funds.  Therefore, on this alternative basis, the court would grant summary judgment for the Trustee on the Fourth Claim for Relief in the complaint and deny summary judgment for C&S on the First Claim for Relief in the counterclaim.

C.    The Asset Lease Funds are not Encumbered by C&S's Security Interest.

The Asset Lease is chattel paper.  NetBank, FSB v. Kipperman (In re Commercial Money Center, Inc.), 350 B.R. 465, 469 (9th Cir. BAP 2006) ("Commercial Money I").  The security agreement between C&S and DRP grants C&S a security interest in chattel paper.  C&S perfected its interest in chattel paper with a properly filed financing statement.  See Cal. Comm. Code § 9312(a).  But here, at least with respect to payments under the Asset Lease collected directly by the Trustee, we're not dealing with chattel paper.

In Commercial Money I, the bankruptcy appellate panel held that there is a critical distinction between a lease and a payment stream under a lease when the payment stream is stripped from the lease and paid to a third-party.  When the payment stream is stripped from the lease and paid to a third party, the bankruptcy appellate panel held that the payment stream is no longer chattel paper but, instead, becomes a newly-created, and a

1  wholly separate and distinct, payment intangible which is a
2  subset of general intangibles. Id. at 469, 476, 478; Federal
3  Deposit Ins. Corp. v. Kipperman (In re Commercial Money Center,
4  Inc.), 392 B.R. 814, 824 (9th Cir. BAP 2008) ("Commercial Money
5  II"). This critical distinction is explained in context below.
6      "Th[e] estate and the Chapter 7 trustee appointed to
7  administer the estate are separate and distinct entities from the
8  pre-petition debtor." In re Central Louisiana Grain Co-Op, Inc.,
9  467 B.R. 390, 396 (Bankr. W.D. La. 2012). That legal distinction
10 is crucial because it means that when DRP filed its bankruptcy
11 petition a new legal entity in the form of the estate was created
12 by operation of federal law. That also means when the Trustee
13 thereafter collected the lease payments under the Asset Lease
14 directly from 2040 FF and on behalf of the estate the payment
15 stream under the Asset Lease was paid to a separate legal entity
16 and thereby stripped from the original payee under the lease
17 agreement. That did two things.
18     First, stripping the lease payments from the Asset Lease and
19 paying them directly to the estate as a third party made the
20 payment stream a new and distinct postpetition intangible that
21 did not exist prepetition when the payment stream remained with
22 the Asset Lease, i.e., was paid to DRP. Second, as a newly-
23 created postpetition payment intangible that did not exist
24 prepetition, the Asset Lease payment stream was not (and could
25 not have been) encumbered by C&S's prepetition security interest.
26 See 11 U.S.C. § 552(a). Nor could it have been proceeds,
27 products, offspring or profits of prepetition collateral. See 11
28 U.S.C. § 552(b)(1). In fact, perfecting an interest in the

1  postpetition payment stream as a payment intangible would have
2  required C&S to file a financing statement that covered it, <u>see</u>
3  <u>In re Commercial Money Center, Inc.</u>, 2007 WL 7144803, *3-4
4  (Bankr. S.D. Cal. 2007) (on remand from <u>Commercial Money I</u>, 350
5  B.R. 465), <u>aff'd</u>, <u>Commercial Money II</u>, 392 B.R. 814, which C&S
6  did not do.

7       In sum, the $153,410.08 in postpetition Asset Lease payments
8  collected directly by the Trustee are not C&S's collateral or
9  proceeds of its collateral, which means those payments are not
10 subject to C&S's security interest.  Therefore, the court will
11 grant summary judgment for the Trustee on the Third Claim for
12 Relief in the complaint and will deny summary judgment for C&S on
13 the Second Claim for Relief in the counterclaim.

14

15       D.    <u>The Liquor License Funds are not Encumbered by C&S's
16            Security Interest.</u>

17       California law prohibits the use of a liquor license as
18 collateral for a loan.  California Business & Professions Code §
19 24076 states that "[n]o licensee shall enter into any agreement
20 wherein he pledges the transfer of his license as security for a
21 loan or as security for the fulfillment of any agreement[.]"  <u>See
22 also</u> <u>In re Morev</u>, 2015 WL 9264937, *4 (Bankr. S.D. Cal. 2015).
23 And perhaps that is why C&S does not assert a security interest
24 <em>directly</em> in the liquor licenses sold by the Trustee.  Instead,
25 C&S maintains that DRP's liquor licenses are general intangibles
26 which makes the funds that the Trustee received from the sale of
27 those liquor licenses proceeds of its collateral and thereby
28 subject to its security interest.  C&S relies primarily on two

- 27 -

1    cases:  <u>Concorde Equity II, LLC v. Bretz</u>, 2011 WL 5056295 (Cal.

2    App. 2011), and <u>Mola Dev. Corp. v. Orange County Assessment</u>

3    <u>Appeals Bd.</u>, 80 Cal. App. 4th 309 (Cal. App. 2000).  Neither are

4    persuasive.

5        An analysis of this issue must begin with <u>Sulmeyer v.</u>

6    <u>California Dept. of Employment Dev. (In re Professional Bar Co.)</u>,

7    537 F.2d 339 (9th Cir. 1976) (per curium), in which the Ninth

8    Circuit stated as follows:  "The bankrupt estate, insofar as it

9    includes liquor licenses, has only the limited value of the

10   licenses encumbered as they may be by the terms of the statutes

11   which create the licenses and provide the conditions of their

12   transfer."  <u>Id.</u> at 340.  And on that basis, <u>Concorde Equity</u> is

13   not helpful or persuasive.  More important, it is not applicable.

14       <u>Concorde Equity</u> involved a priority dispute under California

15   Business & Professions Code § 24074 over proceeds from the sale

16   of a liquor license claimed by two judgment creditors.  <u>Concorde</u>

17   <u>Equity</u>, 2011 WL at *1.  The sale proceeds were insufficient to

18   satisfy both creditors' claims against the judgment debtor/liquor

19   license owner.  <u>Id.</u>  Therefore, in order to determine which

20   creditor had priority to the proceeds from a receiver's sale of

21   the liquor license *for purposes of distribution under California*

22   *Business & Professions Code § 24074*, the court characterized the

23   proceeds as a business asset of the judgment debtor, which made

24   the judgment creditor with a pre-existing security interest in

25   the judgment debtor's business assets a "secured creditor" for

26   purposes of third priority distribution under § 24074.  <u>Id.</u> at

27   *3.

28       The problem with <u>Concorde Equity</u> is that both federal and

- 28 -

1   California courts recognize that its analysis does not apply

2   inside a bankruptcy case.  Citing Gough v. Finale, 39 Cal. App.

3   3d 777, 783-84 (Cal. App. 1974), the Ninth Circuit in

4   Professional Bar also stated as follows:  "Although Cal. Bus. and

5   Prof. Code § 24074 (West Supp. 1975) establishes a system of

6   priorities among creditors in the transfer of a state liquor

7   license, federal rather than California law must be applied in

8   deciding priority when the net proceeds in issue have become

9   available to the [bankruptcy] trustee."  Id. at 340.  In other

10  words, Professional Bar's reliance on Gough is convincing

11  evidence that Concorde Equity is a state law priority

12  distribution case and, as such, its analysis is inapplicable in

13  this federal bankruptcy case.

14      As to Mola, it is true that the court in that case made a

15  passing reference to a liquor license as an intangible.  Mola,

16  however, is a taxation case.  And just because a liquor license

17  may be characterized as an intangible under state tax law, that

18  does not necessarily mean it is an intangible under the Uniform

19  Commercial Code for bankruptcy purposes.

20      In order for a liquor license or its proceeds to qualify as

21  general intangible under Article 9 in the context of a bankruptcy

22  case, and thereby subject to a security interest as such, the

23  liquor license must first qualify as personal property under

24  state law.  See In re Circle 10 Restaurant, LLC, 519 B.R. 95, 128

25  (Bankr. D.N.J. 2014).  This is because Article 9 defines a

26  "general intangible" as "any personal property."  Cal. Comm. Code

27  § 9102(a)(42).  Thus, in states where a liquor license is not

28  property under state law, it also is not (and cannot be) a

1   general intangible under the state's version of Article 9.  See,

2   e.g., Circle 10, 519 B.R. at 135-37; In re Chris-Don, Inc., 367

3   F. Supp. 696, 699 (D.N.J. 2005).  On the other hand, in states

4   where a liquor license is personal property under state law, a

5   liquor license can be a general intangible subject to an Article

6   9 security interest.  See, e.g., In re Ciprian Ltd., 473 B.R 669,

7   672 (Bankr. W.D. Pa. 2012).  Therefore, the threshold question is

8   whether DRP's liquor licenses are personal property under

9   California law for purposes of applying the California Commercial

10  Code in this bankruptcy case.  This court is not persuaded that

11  they are.

12       The court is aware that there are some federal and state

13  cases that characterize a California liquor license as

14  "property."  However, they do so in the context of a *federal*

15  statute and for *federal* law purposes.  See e.g., Golden v. State,

16  133 Cal. App. 2d 640, 643-45 (1955) (for purposes of federal tax

17  lien under federal tax law); Dash, Inc. v. Alcoholic Beverage

18  Control Appeals Bd., 683 F.2d 1229, 1233 (9th Cir. 1982) (for

19  purposes of federal due process analysis).  Characterization of a

20  liquor license as property for *federal law* purposes in general,

21  and particularly for federal tax and due process purposes, does

22  not mean that a liquor license is property under *state law* in

23  general and for purposes of defining the scope of intangibles

24  under a state's commercial code in particular, at least in the

25  context of a bankruptcy case.  Circle 10, 519 B.R. at 133.  That

26  is because the bankruptcy code is unlike the tax code or federal

27  due process analysis because under Butner v. United States, 440

28  U.S. 48 (1979), what is "property" for the "federal purpose" of

                               - 30 -

1   the bankruptcy code is defined by state law.[6] See Circle 10, 519

2   B.R. at 133.

3       In determining whether a California liquor license is

4   personal property under California state law for purposes of the

5   commercial code, one could argue that California law draws a

6   distinction between rights as between the licensee and the state

7   and rights as between the licensee and a third party.  That

8   distinction seems to find some support in Roehm v. County of

9   Orange, 32 Cal. 2d 280 (1948), in which the California Supreme

10   Court stated:  "Although a liquor license is merely a privilege

11   so far as the relations between the licensee and the state are

12   concerned, it is property in any relationship between the

13   licensee and third persons, because the license has value and may

14   be sold."  Id. at 283.  But after noting that distinction, which

15   actually appears to be the court's recitation of a party's

16   argument, the California Supreme Court ultimately rejected it.

17   Instead, the supreme court framed the question before it as

18   follows:  "The controlling question is whether under present

19   constitutional and statutory provisions such [liquor] licenses

20   can now be regarded as personal property for the purposes of

21   taxation."  Roehm, 32 Cal. 2d at 284.  It answered that question

22   in the negative concluding that a liquor license is not taxable

23   personal property under state law.  Id. at 290 ("Although liquor

24   licenses are not taxable as property....").  Thus, Roehm holds

25

---

26      [6]This should not be confused as to what is "property of the
estate" for the federal bankruptcy purpose.  A California liquor

27   license is property of the estate under 11 U.S.C. § 541(a) for
the federal purpose of bankruptcy.  In re Quaker Room, 90 F.

28   Supp. 758, 760-61 (S.D. Cal. 1950).

that a liquor license, albeit an intangible for state taxation purposes, is not taxable (or taxed as) personal property under state constitutional and statutory provisions.  See American Sheds, Inc. v. County of Los Angeles, 66 Cal. App. 4th 384, 392 (Cal. App. 1988).

The California legislature and numerous California cases also describe a liquor license not as a "right" but as a "privilege" conferred by state law.  See California Business & Professions Code § 24079 (describing alcoholic beverage license as a "privilege"); Hevren v. Reed, 126 Cal. 219, 222 (Cal. 1899) (liquor license is neither property nor a contract, in any constitutional sense); Yu v. Alcoholic Bev. Etc. Appeals Bd., 3 Cal. App. 4th 286, 297 (Cal. App. 1992) ("While a license to practice a trade is generally considered a vested property right, a license to sell liquor is a *privilege* that can be granted or withheld by the state."); Cornell v. Reilly, 127 Cal. App. 2d 178, 184 (Cal. App. 1954) (proceeding to revoke liquor license is not for the primary purpose of punishment but "to protect the public, that is, to determine whether a licensee has exercised his *privilege* in derogation of the public interest, and to keep the regulated business clean and wholesome"); Saso v. Furtado, 104 Cal. App. 2d 759, 763-64 (Cal. App. 1951) (explaining that a liquor license is a privilege rather than a state law, contract, or constitutional right).

The court also finds unpersuasive the argument that a liquor license has value apart from the license which transforms the license into personal property and thence into a general intangible under the California Commercial Code.  The court in

1  <u>Circle 10</u> addressed that issue under New Jersey law, which
2  characterizes a liquor license as a privilege and not personal
3  property under state law but also recognizes that a liquor
4  license and its transferability have value to the licensee.  The
5  <u>Circle 10</u> court resolved that conflict by reasoning that any
6  value to the licensee is created and exists solely as a result of
7  the issuance of the license by the state and therefore cannot be
8  bifurcated from the license itself.  <u>Circle 10</u>, 519 B.R. at 131-
9  32.  Thus, the <u>Circle 10</u> court ultimately concluded that any
10  value to the licensee did not make the liquor license personal
11  property and that, in turn, meant that proceeds from the sale of
12  the license could not be subject to a security interest as a
13  general intangible.  <u>Id.</u> at 132.  That analysis is persuasive.
14  Like New Jersey, the value that a California liquor license has
15  to a licensee is created by and exists only as a result of the
16  issuance of the license by the state.  That makes the value
17  inseparable from the license.

18       In sum, a California liquor license is not personal property
19  under state law for purposes of defining it as a general
20  intangible under the California Commercial Code in a bankruptcy
21  case.  That means the Liquor License Funds in the approximate
22  amount of $37,661.60 are not (and cannot be) collateral subject
23  to C&S's security interest.  Put another way, DRP's liquor
24  licenses are not general intangibles under the California
25  Commercial Code because in the context of this bankruptcy case
26  they are not personal property under state law.  Therefore, the
27  court will grant summary judgment for the Trustee on the Second
28  Claim for Relief in the complaint and will deny summary judgment

1  for C&S on the Third Claim for Relief in the counterclaim.

2

3  II.   The Trustee's § 542(a) Turnover Claim

4       C&S maintains the stipulation does not state when it has to

5  pay the Trustee.  That may be the case.  But the Bankruptcy Code

6  does insofar as property of the estate is concerned.

7       An entity, other than a custodian, in possession, custody,

8  or control, during the case, of property of the estate *shall*

9  deliver to the trustee, and account for, the property or the

10 value of the property unless the property is of inconsequential

11 value.  11 U.S.C. § 542(a).  Section 542(a) "creates an

12 affirmative obligation on the part of the party holding estate

13 property to turn the property over[.]"  In re Rutheford, 329 B.R.

14 886, 892 (Bankr. N.D. Ga. 2005).  Moreover, "[t]his affirmative

15 obligation is self-executing and does not require the holding of

16 a hearing or the entry of an order by the bankruptcy court."  In

17 re Prince, 2012 WL 1095506, *9 (Bankr. E.D. Tex. 2012) (citing

18 Knaus v. Concordia Lumber Co. (In re Knaus), 889 F.2d 773, 775

19 (8th Cir. 1989); Boyer v. Carlton, Fields, Ward, Emmanuel, Smith

20 & Cutler, P.A. (Matter of USA Diversified Products, Inc.), 100

21 F.3d 53, 56 (7th Cir. 1996)).

22       The court concludes that $429,505.00 is not of

23 inconsequential value.  And inasmuch as the court has determined

24 that the May 2013 stipulation and the payment that the Trustee is

25 entitled to receive under that agreement are property of the

26 estate, as a matter of law C&S now has an affirmative obligation

27 to turn over $429,505.00 to the Trustee.  And while C&S may think

28 the timing of that turnover obligation is in dispute because the

1  stipulation is silent on that point, that is a non-issue.  The
2  Ninth Circuit has long-recognized that "[i]t is well settled that
3  existing laws are read into contracts in order to fix the rights
4  and obligations of the parties." Rehart v. Clark, 448 F.2d 170,
5  173 (9th Cir. 1971).  In other words, the Bankruptcy Code fills
6  in any gap or any silence in the stipulation with regard to the
7  timing of C&S's payment obligation which, as noted, is an
8  affirmative obligation on the part of C&S to turn over to the
9  Trustee the Settlement Funds as property of the estate.
10  Therefore, for the foregoing reasons, the court will grant
11  summary judgment for the Trustee on the § 542(a) turnover claim
12  in the Fifth Claim for Relief of the complaint.  C&S is ORDERED
13  to turn over $429,505.00, or such portion of the Settlement Funds
14  currently in its possession, to the Trustee within ten days of
15  the entry of judgment.

16

17  **CONCLUSION**

18      For all the foregoing reasons, the Trustee's motion for
19  summary judgment will be granted and judgment will be entered for
20  the Trustee and against C&S on the First, Second, Third, Fourth,
21  and Fifth Claims for Relief in the complaint.  C&S's motion for
22  summary judgment will be denied and C&S will take nothing on the
23  First, Second, Third, and Fourth Claims for Relief in the
24  counterclaim.

25      Dated:  August 14, 2017.

26

27  _____
    UNITED STATES BANKRUPTCY JUDGE
28

- 35 -

**INSTRUCTIONS TO CLERK OF COURT**
**SERVICE LIST**

    The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Howard S. Nevins
2150 River Plaza Dr #450
Sacramento CA 95833-3883

Michael J. Stortz
50 Fremont St 20th Fl
San Francisco CA 94105

Paul J. Pascuzzi
400 Capitol Mall #1750
Sacramento CA 95814